Argued and submitted February 16, reversed and remanded for reconsideration April 20, 1994

THE STEEL YARD, INC.,
*Petitioner,*

*v.*

The Filings of the
NATIONAL COUNCIL ON
COMPENSATION INSURANCE
and Liberty Northwest Insurance Corporation,
*Respondents.*

(91-07-037; CA A79750)

873 P2d 332

Barbee B. Lyon argued the cause for petitioner. With him on the brief was Tonkon, Torp, Galen, Marmaduke & Booth.

Peter A. Ozanne argued the cause for respondent National Council on Compensation Insurance. With him on the brief was Schwabe, Williamson & Wyatt.

Barbara Woodford waived appearance for respondent Liberty Northwest Insurance Corporation.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

WARREN, P. J.

## WARREN, P. J.

Petitioner seeks review of an order of the Department of Insurance and Finance (DIF) that requires it to pay an additional workers' compensation premium. We reverse and remand.

Petitioner is an Oregon corporation that sells iron and steel to retail customers. Its president and sole shareholder, Waltuck, was formerly president and one of two shareholders of The Standard Steel Companies (Standard). The other shareholder was Waltuck's wife. Standard operated three steel "service centers." Standard filed for bankruptcy in 1986. Later, the Hong Kong and Shanghai Banking Corporation (bank) became Standard's lender. Waltuck personally guaranteed Standard's line of credit. In 1988, the bank notified him that it intended to accelerate Standard's loans. Standard defaulted. In April, 1989, the Waltucks and the bank negotiated a settlement that transferred all of Standard's assets to a new corporation called Steel Products, Inc. (SPI), later called Northwest Steel Products, Inc. (NWSPI),[1] in exchange for the bank's surrender of Waltuck's personal guaranty.

In October, 1989, petitioner commenced doing business. In June, 1990, an auditor for respondent National Council on Compensation Insurance (NCCI) performed a classification inspection of petitioner's business. After the inspection, NCCI learned that Waltuck had a prior ownership interest in Standard. After reviewing petitioner's ownership documents and the transfer agreement between Standard and SPI, NCCI changed petitioner's loss experience rating factor,[2] based on its determination that petitioner was a "continuation" of Standard, and that Standard's loss experience rating factor should apply to petitioner. Petitioner's workers' compensation insurer, respondent Liberty Northwest Insurance Corporation (Liberty), assessed an additional premium. Petitioner then appealed the premium assessment

---

[1] NWSPI filed bankruptcy and discontinued operations in November, 1989.

[2] A loss experience rating factor is based on a workplace's safety record. A new business has a loss experience rating factor of 1.00. A poor safety record may result in an increase in the rating factor, which, in turn, can increase the cost of workers' compensation insurance.

to DIF. The director of DIF concluded that Liberty "correctly applied" the modified loss experience rating factor. Petitioner assigns error to the assessment of the additional premium.

■     Petitioner first argues that the director applied a rule that does not resolve whether Standard's loss experience rating factor should be "transferred" to petitioner. NCCI contends that the order is based on the applicable rule. The order refers to the NCCI Experience Rating Plan Manual, part three, rule B, in its discussion of whether petitioner should pay premiums based on the modified loss experience rating factor. That rule provides:

"B.   OWNERSHIP CHANGES

"Changes in ownership interest may affect the continued use of an entity's experience in future experience ratings. Based on the rules of this section of the Plan, when a change occurs, a determination shall be made to exclude or retain an entity's experience.

"* * * * *

"1.   Exclude Experience

"The experience for any entity undergoing a change shall be excluded from future experience ratings if the:

"a.   entire ownership interest *after* the change had no ownership interest *before* the change.

"b.   collective ownership of all those having an interest in an entity both *before* the change and *after* the change amounts to either:

"(1)   less than 1/3 ownership before the change, or

"(2)   less than 1/2 ownership after the change.

"EXCEPTION:   When a change in ownership takes place among members of an immediate family, the experience for all entities shall be retained in future experience ratings of the risk. * * *

"* * * * *

"NOTE:   Future experience ratings of a risk shall retain all experience up until the date of the change. This includes any part of its operations which may have been sold, discontinued, or self-insured.

"c.  If the experience of a risk is to be excluded, the experience modification no longer applies as of the date of the change. An experience modification of 1.00 (unity) shall apply effective the date of the change, unless acquired by an entity with an existing experience modification.

"2.  Retain Experience

"The experience of any entity undergoing a change shall be retained in future experience ratings if not excluded under B.1. For example, the experience of all entities involved in a merger or consolidation is retained." (Emphasis in original.)

After setting forth the rule, the order provides: "The NCCI rule[] * * * tie[s] the experience modification factor to the ownership of the business." However, the order offers no explanation why rule B applies to the facts in this case.

■      An agency must articulate a rational connection between the facts that it finds and the legal conclusions it draws from them. *Mt. Hood Community College v. Employment Div.*, 101 Or App 314, 318, 790 P2d 1164 (1990). As we said in *Home Plate, Inc. v. OLCC*, 20 Or App 188, 190, 530 P2d 862 (1975):

"If there is to be any meaningful judicial scrutiny of the activities of an administrative agency — not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the administrative agency to demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an ad hoc basis — we must require that its order clearly and precisely state what it found to be the facts and fully explain why those facts lead it to the decision it makes."

Here, the order's ultimate finding of fact provides:

"Petitioner failed to meet its burden of proof that neither Waltuck nor his wife maintained [an] ownership interest in SPI or NWSPI and, therefore, the petitioning firm."

Even if substantial evidence supports that finding, we are unable to ascertain how rule B provides authority to impose a modified loss experience rating factor on petitioner.[3]

---

[3] Waltuck gave uncontradicted testimony that he had no ownership interest in SPI or its successor, NWSPI, and that he did not know the identity of the owner or

Rule B on its face applies to ownership changes in *existing* "entities"[4] and states the circumstances under which an entity's loss experience rating does not survive a change in ownership. In this case, the uncontradicted evidence is that petitioner is a new corporation that materially differs from Standard.[5] We find no language in rule B that addresses what loss experience rating factor should apply to a new business owned by a person who formerly owned a different business.[6] Even assuming, for the sake of argument, that Waltuck had an ownership interest in SPI and NWSPI, we cannot determine from the order how rule B provides authority to impose Standard's loss experience rating factor on petitioner. We conclude that DIF's order fails to provide substantial reasons for its determination that rule B applies to the facts in this case. The order articulates no other legal basis on which Liberty was entitled to impose a modified loss experience rating on petitioner.

Reversed and remanded for reconsideration.

---

owners of those companies. Waltuck also indicated in writing, on a form provided by Liberty, that he did not know who the owner or owners of SPI or NWSPI were.

[4] The record does not include any rule defining "entity."

[5] Petitioner operates at a different location than did Standard. Unlike petitioner, Standard provided services that added value to the steel it sold. Moreover, Standard and its successors did business on a larger scale than petitioner.

[6] NCCI also argues that rule B 2. is applicable. However, that argument is based on factual allegations that Waltuck and his wife "own 100% of the stock in Standard Steel," and have "simply continued the business of selling steel products that they owned through their holdings in Standard Steel." The *only* evidence in the record that Waltuck's ownership of Standard stock after the sale of all of its assets to SPI consist of (1) Waltuck's uncontradicted testimony that he and his wife "were divested of [the stock] or we divested ourselves of it or negotiated settlement or however you want to characterize what happened," and (2) Waltuck's statement in a letter to Liberty that he "previously held stock" in Standard. There is *no* evidence in the record that petitioner sells or sold any steel products, or utilizes in any way any other assets acquired from the Waltucks' holdings in Standard.